1
2
3
4
5
6
7
8

## UNITED STATES DISTRICT COURT

9

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

10

## WESTERN DIVISION

| | | |
|---|---|---|
| **In the Matter of the Extradition of** | ) ) ) | **No. CV 13-5059 VAP (AJW)** |
| **GUSTAVO LUNA-RUIZ,** a/k/a Gustavo Luna Guzman, a/k/a Gustavo De La O, a/k/a Tavo | ) ) ) ) ) | **MEMORANDUM AND ORDER CERTIFYING EXTRADITABILITY** |
| **A Fugitive from the Government of the United Mexican States.** | ) ) ) ) ) ) ) ) ) | |
| | ) | |

19

### Introduction

The United States of America (the "government" or the "United States"), acting on behalf of the United Mexican States ("Mexico"), has requested the extradition to Mexico of Gustavo Luna-Ruiz, also known as Gustavo Luna Guzman, Gustavo De La O, or "Tavo" ("Luna-Ruiz" or "relator"), pursuant to the extradition treaty between the United States and Mexico. See Extradition Treaty between the United States of America and the United Mexican States, signed at Mexico City on May 4, 1978 ("Extradition Treaty"), and entered into force January 25, 1980, T.I.A.S. No. 9656, 31 U.S.T. 5059, 1980 WL 309106 (Jan. 25, 1980).

On March 29, 2013, the United States filed a complaint on Mexico's behalf for the extradition of Luna-Ruiz in <u>United States of America v. Gustavo Luna-Ruiz</u>, 13-MJ-00959.  Luna-Ruiz was arrested in the United States pursuant to an arrest warrant on April 18, 2013.  He subsequently was released on bond, with conditions.

The  United States filed formal extradition papers and a request for extradition ("Extradition Request") under seal on July 17, 2013.  On September 23, 2013, the United States filed the Extradition Request in redacted form ("Redacted Papers" or "RP")[1] and a Memorandum of Points and Authorities in Support of Extradition.  The Extradition Request includes a certified copy of a February 1, 2000 arrest warrant issued by a court in Mexico.  The arrest warrant charges Luna-Ruiz with the crime of aggravated homicide in the August 29, 1999 death in Tecate, Baja California, Mexico of Jesus Francisco Cordero Amador ("Cordero"), in violation of Articles 123, 147, 148, and 126 of the Penal Code for the State of Baja California, Mexico. [RP 80, 93-103].  The Extradition Request indicates that the crime of aggravated homicide is punishable by a term of imprisonment of 20 to 50 years and is within the scope of Article 2 of the Extradition Treaty. [RP 1-3, 108].

Through counsel, Luna-Ruiz filed an opposition to the extradition request ("Opp.") and supporting exhibits under seal on January 9, 2014.  The government filed a reply memorandum on January 12, 2014.

An extradition hearing was conducted on February 18, 2014.  The government and Luna-Ruiz were represented by counsel during the hearing.  The court has considered the parties' written submissions, the documentary record in this case, the parties' stipulations made on the record during the hearing, and counsel's oral arguments during the hearing.

## Discussion

### Standard for Certification of Extraditability

Extradition from the United States is governed by 18 U.S.C. section 3184, which confers jurisdiction on "any justice or judge of the United States, or any magistrate judge authorized so

---

[1]   The Extradition Request is not consecutively paginated, so for ease of reference, most citations in this memorandum are to the Redacted Papers.

to do by a court of the United States" to conduct an extradition hearing under the relevant extradition treaty between the United States and the requesting nation, and to issue a certification of extraditability to the Secretary of State.[2]   18 U.S.C. § 3184; In re Requested Extradition of Kirby, 106 F.3d 855, 859 (9th Cir. 1996).

To obtain a certification of extraditability on behalf of a requesting state, the United States has the burden of demonstrating each of the following elements: (1) the court possesses subject matter jurisdiction to conduct extradition proceedings; (2) the court possesses personal jurisdiction over the person named in the extradition request; (3) a valid extradition treaty exists between the requesting state and the United States; (4) the extradition treaty between the requesting state and the United States is, and at all relevant times has been, in full force and effect; (5) the person named in the extradition request is charged with having committed a criminal offense within the jurisdiction of the requesting state; (6) the charged offense is extraditable under the relevant extradition treaty (that is, the offense charged falls within the terms of the relevant extradition treaty); (7) the person named in the extradition request is the person arrested and brought before the court; and (8) there is competent evidence establishing probable cause to believe that the person named in the extradition request committed the charged offense. See 18 U.S.C. §§ 3184, 3190;  Manta v. Chertoff, 518 F.3d 1134, 1140 (9th Cir. 2008); Prasoprat v. Benov, 421 F.3d 1009, 1013 (9th Cir. 2005), cert. denied, 546 U.S. 1009 (2006); Quinn v. Robinson, 783 F.2d 776, 782-783 (9th Cir.), cert. denied, 479 U.S. 882 (1986); In re Extradition of Santos, 795 F. Supp. 2d 966, 969-970 (C.D. Cal. 2011). "Extradition treaties are to be liberally construed so as to effect their purpose, that is, to surrender fugitives for trial for their alleged offenses." Valentine v. United States ex rel. Neidecker, 299 U.S. 5, 14 (1936).  "After an extradition magistrate certifies that an

---

[2]   Within the Central District of California, magistrate judges are authorized by general order to preside over extradition proceedings.  See C.D. Cal. Gen. Ord. 05-07.

individual can be extradited, it is the Secretary of State, representing the executive branch, who ultimately decides whether to surrender the fugitive to the requesting country." Vo v. Benov, 447 F.3d 1235, 1237 (9th Cir. 2006).

During the extradition hearing, counsel for the government and relator stipulated that all of the elements required for certification of extraditability except the element of probable cause have been satisfied.  Accordingly, the only disputed issue is whether the record contains competent evidence establishing probable cause to believe that Luna-Ruiz committed the charged offense of aggravated homicide.

**Authentication and admissibility of evidence**

The Federal Rules of Evidence do not apply in extradition hearings.  Then v. Melendez, 92 F.3d 851, 855 (9th Cir. 1996); Oen Yin-Choy v. Robinson, 858 F.2d 1400, 1406 (9th Cir. 1988). Instead, the admissibility of evidence in extradition proceedings is governed by "the general extradition law of the United States and the provisions of the" Extradition Treaty. Emami v. U.S. Dist. Ct., 834 F.2d 1444, 1450 (9th Cir. 1987); accord, Oen Yin-Choy, 858 F.2d at 1406.

"The authentication requirements for documentary evidence are contained in 18 U.S.C. § 3190, which specifies that 'the certificate of the principal diplomatic or consular officer of the United States resident in such foreign country shall be proof that submitted documents are authenticated in the manner required.'" Barapind v. Enomoto, 400 F.3d 744, 748 (9th Cir. 2005) (en banc) (per curiam); see Bingham v. Bradley, 241 U.S. 511, 517 (1916) (holding that documentary evidence that was "properly authenticated in accordance with" the predecessor provision to section 3190 was "competent" and "sufficient" to establish probable cause).

The Extradition Treaty states that the documents "accompany[ing] the request for extradition, shall be received in evidence when: . . . b) In the case of a request emanating from the United Mexican States, they are certified by the principle [sic] diplomatic or consular officer of the

4

United States in Mexico." Extradition Treaty, art. 10, § 6.  The Extradition Treaty imposes no supplementary authentication requirements or other requirements for the admissibility of documentary evidence.

The documents submitted by Mexico in support of the Extradition Request were certified on June 7, 2013 by Ambassador Earl Anthony Wayne, who at the time was the principal diplomatic officer of the United States in Mexico. [RP 1-3].  Therefore, those documents have been properly authenticated pursuant to 18 U.S.C. § 3190 and the Extradition Treaty.  In any event, relator does not challenge the admissibility in this extradition proceeding of any of the evidence submitted in support of the Extradition Request.  See Man-Seok Choe v. Torres, 525 F.3d 733, 740 (9th Cir. 2008) (holding that where it was undisputed that the government's evidence was "certified and authenticated in accordance with the admissibility requirements of" the relevant treaty and 18 U.S.C. § 3190, "the magistrate judge [was] authorized to consider it").

**Probable cause**

Relator contends that the government's evidence fails to establish probable cause to believe that he committed the charged offense, and that even if the government's evidence amounts to probable cause, evidence proffered by relator in opposition to the extradition request "obliterates" the government's evidence of probable cause. [Opp. 13-25].

The Extradition Treaty states that an "extradition shall be granted only if the evidence be found sufficient, according to the laws of the requested Party, either to justify the committal for trial of the person sought if the offense of which he has been accused had been committed in that place or to prove that he is the person convicted by the courts of the requesting Party."  Extradition Treaty, art. 3.  This provision "requires extradition under the [Extradition] Treaty to be based on competent evidence that would be sufficient to establish probable cause to hold a defendant for trial under United States law."  Wang v. Masaitis, 316 F. Supp. 2d 891, 898 (C.D. Cal. 2004)

(construing nearly identical treaty language) (quoting Emami, 834 F.2d at 1447); see Barapind, 400 F.3d at 747 ("Certification of extradition is lawful only when the requesting nation has demonstrated probable cause to believe the accused person is guilty of committing the charged crimes."); see also 18 U.S.C. § 3184; Mainero v. Gregg, 164 F.3d 1199, 1205 (9th Cir. 1999) (stating that the record must "contain[] competent evidence to support the conclusion that there was probable cause to believe the petitioner guilty") (quoting Zanazanian v. United States, 729 F.2d 624, 626 (9th Cir. 1984)), superseded by statute on other grounds as stated in Cornejo-Barreto v. Seifert, 218 F.3d 1004, 1009 n.5  (9th Cir. 2000).

"[T]he probable cause standard applicable in extradition proceedings is identical to that used by courts in federal preliminary hearings.  The burden of the government is to offer evidence that would support a reasonable belief that the defendant was guilty of the crime charged.  The probable cause standard applicable in extradition proceedings has been described as evidence sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the accused's guilt." Sidali v. I.N.S., 107 F.3d 191, 199 (3d Cir. 1997) (internal quotation marks omitted) (citing Ahmed v. Wigen, 910 F.2d 1063, 1066 (2d Cir. 1990); United States v. Wiebe, 733 F.2d 549, 553 (8th Cir. 1984); Sindona v. Grant, 619 F.2d 167 (2d Cir. 1980)); see Emami, 834 F.2d at  1452 (explaining that "[a]n extradition proceeding is not a trial," and that "the relevant determination is confined to whether a prima facie case of guilt exists that is sufficient to make it proper to hold the extraditee for trial") (citing Charlton v. Kelly, 229 U.S. 447, 461 (1913)).

"The function of the committing magistrate is to determine whether there is competent evidence to justify holding the accused to await trial, and not to determine whether the evidence is sufficient to justify a conviction." Collins v. Loisel, 259 U.S. 309, 316 (1922)); see Quinn, 783 F.2d at 817 n.41 (noting the "well-established rule that extradition proceedings are not to be

converted into a dress rehearsal for trial") (quoting <u>Jhirad v. Farrandina</u>, 526 F.2d 478, 484 (2d Cir.), <u>cert. denied</u>, 429 U.S. 833 (1976));   <u>see also</u> <u>Blaxland v. Commonwealth Dir. of Pub. Prosecutions</u>, 323 F.3d 1198, 1208 (9th Cir. 2003) ("American judicial officers conduct a circumscribed inquiry in extradition cases."). "The magistrate does not weigh conflicting evidence and make factual determinations but, rather, determines only whether there is competent evidence to support the belief that the accused has committed the charged offense." <u>Quinn</u>, 783 F.2d at 815. "If the evidence is sufficient to sustain the charge, the inquiring magistrate judge is required to certify the individual as extraditable to the Secretary of State and to issue a warrant."   <u>Blaxland</u>, 323 F.3d at 1208 (citing <u>Lopez-Smith v. Hood</u>, 121 F.3d 1322, 1326 (9th Cir. 1997)).

Although the federal probable cause standard applies, the probable cause finding need not be "predicated upon evidence that would be admissible at a preliminary hearing or before a grand jury in the United States." <u>Zanazanian</u>, 729 F.2d at 626 (citing <u>Collins</u>, 259 U.S. at 317).   The extradition judge may consider hearsay evidence, unsigned translations of a witness's statements, unsworn statements of absent witnesses, and summaries by the police or prosecutor of a witness's testimony or statement, provided that those documents are properly authenticated and—as is true in this case—the governing extradition treaty does not require that a witness's statements be executed under oath.   <u>See</u> <u>Collins</u>, 259 U.S. at 317; <u>Man-Seok Choe</u>, 525 F.3d at 740; <u>Barapind</u>, 400 F.3d at 748; <u>Then</u>, 92 F.3d at 855; <u>In re Requested Extradition of Smyth</u>, 61 F.3d 711, 720-721 (9th Cir.), <u>as amended by</u> 73 F.3d 887 (9th Cir.1995), <u>cert. denied</u>, 518 U.S. 1022 (1996); <u>Emami</u>, 834 F.2d at 1451-1452; <u>Quinn</u>, 783 F.2d at 815; <u>Zanazanian</u>, 729 F.2d at 626-628.

**Government's evidence in support of probable cause**

To establish probable cause, the government has submitted documentary evidence gathered by police and prosecutorial authorities in Mexico, including, among other things, reports of

statements made by individuals claiming to be eyewitnesses to Cordero's alleged homicide, the results of photo identification procedures, and investigative reports.

Witnesses RTS (also referred to in the Extradition Request by the initials TSR) and JUT (also referred to in the Extradition Request by the initials UTJ) each gave a sworn statement to the public prosecutor on September 1, 1999 and were interviewed by police on September 7, 1999. When giving their sworn statements, RTS and JUT provided their names and certain personal information but did not furnish identification. [RP 116-117, 120-121, 124-125, 126]. RTS stated that on August 28, 1999 at about 11:00 p.m., he and some other men gathered at JUT's home and drank some beers. Somewhere between 3:45 and 4:30 in the morning, while RTS, JUT, and Cordero were sitting in JUT's yard, RTS noticed a white vehicle, which appeared to be a Buick Regal, being driven eastbound by a man nicknamed "Tavo," who was alone in the car. Cordero approached the driver's side door and began talking with Tavo. At this point RTS walked behind another car, but where he could still see the white car, to relieve himself. After a few minutes, RTS heard Tavo tell Cordero: You guys owe us one, because you killed 'El Mike,' one of my best friends." Cordero stuck his head and part of his body through the window and punched Tavo. RTS, who was behind the white car, starting walking toward Cordero. As soon as RTS got to the drivers' side window he heard a gunshot and ducked. Tavo drove off, and RTS saw Cordero lying on the ground, bleeding from his mouth and nose. Cordero was taken to the hospital, where a doctor told RTS that Cordero had died. [RP 116-117, 126].

JUT stated that at about 4:00 a.m. on August 29, 1999, he was outside in his yard with RTS and Cordero drinking beer and talking when he noticed a white vehicle, "apparently a Regal, by the guy named El Tavo," pulling up in front of his house. Cordero made a hand movement to greet El Tavo, approached the driver's side of the car, and began talking with El Tavo. JUT heard Cordero and El Tavo saying "that they did not want any trouble . . . ." [RP 120]. Later, JUT heard

El Tavo say, "You owe me one." JUT yelled at Cordero to move away and stop arguing. JUT saw Cordero lunge through the window with the upper half of his body, pull out again, and then try to get into the car through the window again. Suddenly JUT heard a "strong noise, apparently a firearm shot"; at the same time he saw something that looked like fire, and he saw that El Tavo had his right arm extended toward Cordero and was holding something in his right hand. Cordero fell to the ground. RTS was walking toward the driver's side door when JUT yelled, "Jessy has been shot, help him," and the white car drove off to the east. JUT's sister and RTS took Cordero to the hospital. JUT later learned that Cordero died. JUT described El Tavo as brown, obese, about "1.75 cm"[3] tall, without a beard or a mustache. [RP 120-121, 124-124].

On September 21, 1999, Mexican authorities obtained additional statements from RTS and JUT. JUT stated that he was present and was about six meters away when "Gustavo Guzman Luna" shot Cordero. JUT also said that he had seen Gustavo Guzman Luna "closely many times through the years." JUT was shown a color copy of relator's State of California driver's license and positively identified relator as the person who shot Cordero. [RP 122, 131-132]. On the same date, RTS was also shown a color copy of relator's State of California driver's license and positively identified relator as the person who shot Cordero. RTS said that he had been a "friend of Gustavo Guzman Luna six years ago," and that he was standing about three meters away when Gustavo Guzman Luna shot Cordero from the interior of the vehicle he was driving and then drove away. [RP 118, 131-133].

A police report dated September 7, 1999 states that as part of the investigation into Cordero's death, Mexican authorities separately questioned two women at their domicile in Tecate. One of the women said that she was Luna-Ruiz's aunt, and the other one said that she was his wife. Both declined to give their names for fear of "vengeance." [RP 127]. Both said that Luna-Ruiz had told them that he had a problem and had to leave the city without saying where he was going, and

---

[3]   This appears to be a translation or transcription error.

that they knew he had severely injured someone with a gun, and that the person had died of his injuries. They also indicated that it was possible that he gone to the United States, where he worked. After being questioned about the white vehicle, "they pointed to a garage with a wooden door," in which officers located a white Buick Regal, whose license plate number and vehicle identification number the authorities noted. They inspected the vehicle and found a spent .25 caliber shell in the back seat. The report noted that the shell would be sent to the "Expert Services Division" for comparison with the bullet that was found in Cordero's head, and that the Buick Regal was impounded. [RP 127-128, 135].

About seven years later, Mexican authorities conducted additional investigation into Cordero's homicide. On March 9, 2006, they obtained a statements from YAG (also referred to in the Extradition Request by the initials JAG and AGY) and her husband, FFML.   [RP 40-52]. YAG said that she knew "the person named Gustavo Luna Ruiz (a.k.a) El Tavo" because he was married to her sister, and that in 1999 he had gone to live in the United States. YAG also said that family members had commented that her brother-in-law had been involved in a homicide. YAG identified a photograph of relator as her brother-in-law from a six-pack photo array. [RP 47-52]. FFML also identified a photograph of relator as his brother-in-law from a six-pack photo array. FFML said that he recalled that in 1999, relator went to live in the United States. [RP 40-46].

On September 23, 2006, Mexican authorities met with JUT in Lake Elsinore, California. JUT ratified in all respects the sworn statement he had provided on September 1, 1999. JUT also identified a photograph of relator as the person as the person who shot Cordero. [RP 86, 153-157].

**Application of the probable cause standard**

Relator contends that the government's evidence is insufficient to establish probable cause, and that even if the government's showing is deemed sufficient, relator's proffered evidence "obliterates" probable cause.

Relator challenges the reliability of the statements given by RTS and JUT on the grounds that: (1) both witnesses described a long night of consuming alcohol; (2) there is no indication that either witness had an unobstructed view of Tavo or El Tavo, the driver of the vehicle; (3) inconsistencies exist within and between their statements; and (4) the only physical description given by either witness deviates from the description noted on relator's California driver's license. [Opp. 18-19].

RTS and JUT said that they had been drinking beer after 11:00 p.m. on August 28, 1999 and during the early morning hours of August 29, 1999. However, they said nothing about how much beer they consumed during that period. There is no evidence in the record suggesting that either RTS or JUT was inebriated or impaired when they witnessed the events described in their statements.

JUT said that he was about six meters away from El Tavo's car when he witnessed the events described in his statements, and RTS said that he was about three meters away, but that as Cordero and El Tavo were arguing, he was approaching the passenger side of the vehicle from the rear and was almost at the car door when he heard a shot. [RP 118, 122]. Neither witness said that his view was obstructed or that he was unsure of his identification of the driver and shooter as "El Tavo" or "Tavo."

"The credibility of witnesses and the weight to be accorded their testimony is solely within the province of the extradition magistrate." Quinn, 783 F.2d at 815. The statement of even a single eyewitness identifying the accused can establish probable cause even if the witness's credibility is open to question. See Barapind, 400 F.3d at 752 (holding that the extradition court was justified in concluding that an eyewitness's statement identifying the relator as a shooter established probable cause on murder charges even though the relator produced an affidavit from the eyewitness denying that he identified the relator, and that "a trial would be required to determine who was telling the truth").

The witnesses' alcohol consumption and their vantage point when observing the events described in their statements could be fruitful topics for cross-examination at trial, but on the record before the Court, those statements have sufficient weight and indicia of reliability to constitute competent evidence supporting the existence of probable cause. See Choe, 525 F.3d at 740 (holding that a witness's alleged lack of credibility was "merely a weakness in [the requesting party's] case; it does not 'completely obliterate[ ]' the evidence of probable cause," and that the magistrate judge did not err in refusing to allow the relator to conduct discovery on the witness's credibility because "such evidence wouldn't be admissible"); Quinn, 783 F.2d at 815 (holding that although the government's evidence was not "overwhelming," the magistrate judge "was free to determine the weight to be accorded to" witnesses' descriptions of the killer).

The case cited by relator, Gill v. Imundi, 747 F. Supp. 1028, 1041 (S.D.N.Y. 1990), does not compel a different conclusion. In that case, the district court concluded that the magistrate judge had "the authority and discretion to go beyond the face of the government's affidavits for purposes of determining credibility or reliability" where "the accused sought to introduce explanatory or obliterating evidence," and that "[s]everal cases support the capacity of the extradition judge to make such determinations under those circumstances." Gill, 747 F. Supp. at 1041. The magistrate judge was not *"required* to do so," however, and did not abuse his discretion by "limiting himself to facial evaluation of affidavit testimony . . . ." Gill, 747 F. Supp. at 1041 (italics added) (citing Quinn, 783 F.2d at 815; Escobedo v. United States, 623 F.2d 1098, 1102 n.10 (5th Cir. 1980)).

Relator also argues that there is an inconsistency between the statements JUT gave on September 1, 1999 and September 7, 1999.  Relator points out that in the first statement, JUT said that "El Tavo" shot Cordero after telling Cordero, "You owe me one." [RP 120]. In the second statement, however, JUT said that "El Tavo" shot Cordero after Cordero told "El Tavo" that "he knew they had killed a friend and they had to pay for it."  [RP 125; see Opp. 6-7, 19].  Relator also contends that there is an inconsistency between the statements made by JUT and RTS, in that RTS

reported that he and several others went to JUT's house at about 11:00 p.m. on August 28, 1999, while JUT said that he gathered with friends at the home of "El Teco" at around 11:00 p.m. that evening and returned to his house at around 3:30 a.m. with RTS and Cordero. [RP 116, 120].

A review of the original Spanish-language version of the report containing JUT's September 7, 1999 statement suggests that the purported inconsistency between JUT's statements may be due to a translation error.   [Extradition Request, "Anexo 7," page 2].   Even if genuine, that inconsistency and the witnesses' inconsistent statements about where they gathered concern collateral details and do not materially detract from the government's probable cause showing. JUT's statements are consistent in recounting an argument or struggle between El Tavo and Cordero and in identifying El Tavo as the person who shot Cordero on August 29, 1999, and they are consistent in that respect with the statements of RTS.   JUT and RTS also both identified a photograph of relator as the man they called El Tavo or Tavo.   Thus, the purported inconsistencies within and between their statements do not destroy or negate the government's probable cause showing.   See Gamez v. Stafford, 2012 WL 4471579, at *2 (S.D. Cal. Sep. 25, 2012) (holding that "[t]he eyewitness accounts in this matter were inconsistent in some respects, but not so much that the reliability of each witness was obliterated," and that "[w]hile this may create issues in Mexico's pending prosecution of [the relator]," it did not demonstrate the absence of competent evidence supporting probable cause).

Relator also challenges the reliability of JUT's description of El Tavo as a "brown," "obese" man about 1.75 meters (about 5 feet, 9 inches) tall without a beard or a mustache.   Relator points to his State of California driver's license issued on January 16, 1997, which states that relator was 5 feet, 11 inches tall and weighed 180 pounds, and which includes a photograph of relator wearing a light mustache. [See Opp., Ex. D].   The presence of a mustache in relator's driver's license photograph is not probative of relator's appearance in August 1999 because relator could easily have shaved it off at any time.   In any event, the mustache relator was wearing in his driver's

license photograph is not so dark, heavy, or bushy that an eyewitness could not reasonably have overlooked it during a night-time encounter.  The arguable inconsistency between relator's height and weight as indicated on his driver's license and as contained in JUT's description of the shooter is a matter that bears on the credibility of JUT's physical description, but that discrepancy is not so pronounced that it negates the existence of probable cause.  See Gamez, 2012 WL 4471579, at *2 (rejecting the argument that probable cause did not exist because summaries of two eyewitness accounts "contained somewhat conflicting physical descriptions of [the relator] and inconsistent accounts of the timing of the crime," and explaining that "so long as reliability issues do not completely obliterate the evidence supporting probable cause," the extradition judge was "free to determine the weight to be accorded each eyewitness statement") (internal quotation marks omitted).

Relator contends that the government's probable cause showing is compromised because the authorities in Mexico attempted to locate RTS in Tecate, Mexico 2006 but were unable to do so and apparently have had no contact with him since September 21, 1999. [Opp. 6; RP 34]. The unavailability of RTS may hinder Mexico's prosecution of relator but does not prevent the government from establishing probable cause.  In general, hearsay, including statements provided by absent witnesses, is admissible to establish probable cause. See Collins, 259 U.S. at 317 ("[U]nsworn statements of absent witnesses may be acted upon by the committing magistrate, although they could not have been received by him under the law of the state on a preliminary examination."); Quinn, 783 F.2d at 815 (stating that hearsay may be competent evidence for purposes of demonstrating probable cause); Zanazanian, 729 F.2d at 626-628 (stating that it is "well-established that at least one level of hearsay is competent for extradition purposes," and holding that while multiple hearsay "might in certain cases result in decreased reliability," police reports describing witnesses' statements that were specific and detailed were "sufficiently reliable to be deemed competent").  The possibility that RTS may be unavailable to trial is not an issue in

this proceeding. <u>See</u> <u>Santos</u>, 795 F. Supp. 2d at 981 (holding that the relator's inability to locate one of the witnesses who provided a statement inculpating him and the requesting party's inability to secure the witness's attendance at a criminal trial did "not preclude reliance on his statement to establish probable cause").

Relator notes that neither RTS nor JUT provided identification when they provided statements to the authorities in September 1999. [<u>See</u> Opp. 4, 6]. The witnesses' failure to provide a legally acceptable form of identification does not render their statements inadmissible. <u>Cf.</u> <u>Mainero</u>, 164 F.3d at 1206 (holding that the extradition judge permissibly considered the testimony of "a confidential witness, which independently corroborates the involvement of" the accused). Furthermore, JUT provided identification (a driver's license issued by the State of Baja California, Mexico) on September 23, 2006, when he ratified his prior statements inculpating relator and identified relator's photograph from a six-pack photo array. [RP 154].

Relator contends that the identifications made by RTS and JUT based on relator's State of California driver's license are impermissibly suggestive.   [Opp. 19-21]. Relator argues that "identification arising from single-photograph displays may be viewed in general with suspicion," and that an extradition court faced with "essentially the same facts" as this case rejected a single-photo identification on the ground that it was highly suggestive. [Opp. 19-20 (quoting <u>Manson v. Braithwaite</u>, 432 U.S. 98, 116 (1977) and citing <u>In re Extradition of Chavez</u>, 408 F. Supp. 2d 908, 914 (N.D. Cal. 2005))].

Relator's contentions do not warrant disregarding the identifications at issue. "'[T]here is no per se rule that specifies which identification procedures are "competent" for probable cause purposes.' An identification based on a single photograph may be competent evidence of identity in an extradition proceeding." <u>Manta</u>, 518 F.3d at 1144-1145 (quoting <u>Quinn</u>, 783 F.2d at 815, and citing <u>Escobedo v. United States</u>, 623 F.2d 1098, 1102 & n.10 (5th Cir.) (holding that an identification based on a single photograph was competent to establish probable cause), <u>cert.</u>

denied, 449 U.S. 1036 (1980)).   "[A]lthough the magistrate may take the circumstances of an identification into account in assessing its reliability," an identification "does not fail to constitute competent evidence merely because the required United States procedures for admissibility of the identification at trial were not followed." Quinn, 783 F.2d at 815 (citing Zanazanian, 729 F.2d at 627; Escobedo, 623 F.2d at 1102 & n.10).

Manta is instructive.  In that case, the Ninth Circuit rejected the relator's contention that a photo identification was "impermissibly suggestive" because it occurred eight years after the witness had last seen the relator, was based on a single photograph, and the photograph was displayed as part of a passport with the relator's name and other identifying information.  Manta, 518 F.3d at 1144. The Ninth Circuit observed that "our case law regarding what identification is proper in extradition hearings" did not support the relator's arguments.   The Ninth Circuit concluded that under the "totality of the circumstances," the magistrate judge properly credited the identification, in part because the witness had had "multiple interactions" with the relator prior to the identification. Manta, 518 F.3d at 1145 (citing Neil v. Biggers, 409 U.S. 188, 199-200 (1972)).[4]

Here, even if the Biggers factors apply, they do not warrant a finding that the photographic identifications of relator made by RTS and JUT after viewing relator's driver's license created a

---

[4]    Biggers is one of a series of United States Supreme Court cases considering when admission of an out-of-court eyewitness identification during a criminal trial violates a defendant's due process rights and articulating the standard that trial judges must apply when considering suppression of such an identification. See Perry v. New Hampshire, – U.S. –, 132 S.Ct. 716, 720-721, 724-725 (2012); Neil, 409 U.S. at 198-200. In Biggers, the Supreme Court held that due process requires suppression of an out-of-court eyewitness identification only when, under "the totality of the circumstances," the identification procedure was both unnecessarily suggestive and created a "substantial likelihood of misidentification," and that "the factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." Biggers, 409 U.S. at 198-200; see Perry, 132 S.Ct. at 724-725.   If the identification procedure does not create a substantial likelihood of misidentification and there is no other barrier to its admission, it may be submitted to the jury. Perry, 132 S.Ct. at 725; Biggers, 409 U.S. at 199-200.

"substantial likelihood of misidentification."[5]  Based on the government's evidence, both witnesses had an adequate opportunity to view the man who drove up to JUT's house and subsequently shot Cordero.  RTS said that he was three meters away, and JUT said that he was six meters away.  The exact amount of elapsed time is not clear from the record, but it is clear that the incident was not extremely brief in duration, but rather involved a series of verbal and physical exchanges between the driver of the car and Cordero that likely would have given the witnesses at least a few minutes to observe the driver.

Relator contends that the record does not establish that either man had an unobstructed view. [Opp. 19]. On the other hand, nothing in the record suggests that their view was obstructed, or that they did not have an adequate opportunity to view the driver of the car.  As noted above, JUT provided a physical description of the driver that was generally consistent with relator's appearance in his driver's license photograph.  The witnesses' statements indicate that, at a minimum, their attention was drawn to the driver of the car when he drove up, and again when he and Cordero started arguing or struggling.  Therefore, any lapse of attention by RTS when he went behind another vehicle in the interim to relieve himself is not dispositive.  Moreover, RTS said that he could see the white car at all times.  Both RTS and JUT expressed a high degree of certainty that the man who shot Cordero, the man they knew as "El Tavo" or "Tavo," was the man whose driver's license they were shown.  Finally, RTS and JUT identified relator from his driver's license photograph less than a month after they witnessed Cordero's shooting.  JUT said that he had seen relator "closely many times through the years," while RTS said that he had been a friend of relator's six years ago. [RP 118, 122].   Under Biggers and Manta, the identifications of relator by RTS and JUT from relator's driver's license are competent evidence supporting probable cause for extradition purposes.

---

[5]   Studies have demonstrated that even eyewitness identifications possessing indicia of reliability can be, and often are, inaccurate.  This Court, however, is bound to apply the legal standard articulated by the United States Supreme Court for evaluating the risk of misidentification and is not free to modify that standard based on its view of the scientific literature.

The cases on which relator relies are distinguishable.  In <u>Chavez</u>, two men, both relatives of a murder victim, identified the relator from a single photograph more than seven years after the murder occurred.  Neither man witnessed the killing, nor had either man seen the relator for a period of at least seven years preceding their identification.  It was not clear from the record that the photograph in the record was the one shown to those witnesses, nor could it be discerned where or when the photograph was taken.  <u>Chavez</u>, 408 F. Supp. 2d at 914.

The court in <u>Chavez</u> also cited two district court decisions from outside the Ninth Circuit in which extradition courts had determined that photo identifications by eyewitnesses were too unreliable to establish probable cause to extradite.  <u>See</u> <u>Chavez</u>, 408 F. Supp. 2d at 914 (citing <u>In re Extradition of Sandhu</u>, 1997 WL 277394, at *7 (S.D.N.Y. May 23, 1997); <u>In re Extradition of Cervantes Valles</u>, 268 F. Supp. 2d 758, 766-767 (S.D. Tex. 2003)).  Those cases, too, are distinguishable. In <u>Sandhu</u>, the court held that a post-crime photo identification by a single eyewitness from a mug shot a year and a half after the crime did not, "by itself, suffice" to demonstrate probable cause, both because a single photograph was used and because the identification occurred a year and a half after the crime.  <u>Sandhu</u>, 1997 WL 277394, at *7.  In <u>Cervantes Valles</u>, eyewitnesses were shown a seven-photo array containing two pictures of the relator, one of which was the only profile shot in the array, five years after the crime. The court held that under the totality of the circumstances, the photo array was impermissibly suggestive and led to a substantial likelihood of irreparable misidentification, but nothing in the decision indicates that the eyewitnesses were acquainted with the relator prior to identifying him.  <u>Cervantes Valles</u>, 268 F. Supp. 2d at 766-767, 774-775. Moreover, there was other evidence that "overwhelmingly convinced" the court that a "textbook case of mistaken identity" had occurred, and that the relator was not the person named in the extradition request.  <u>Cervantes Valles</u>, 268 F. Supp. 2d at 774-775.

For the reasons described above, relator's arguments lack merit. The government's evidence is sufficient to establish probable cause to believe that Luna-Ruiz committed the charged offense of aggravated homicide.

**Admissibility of Luna-Ruiz's evidence**

Relator contends that even if the government's showing is sufficient to establish probable cause, his proffered evidence "obliterates" probable cause and should be admitted. [Opp. 21-25].

Relator's evidence includes the declarations of Elizabeth De La O ("De La O"), relator's ex-wife ("De La O Decl."); Mirtha Evelia Ruiz-Tapia ("Ruiz-Tapia") ("Ruiz-Tapia Decl."), relator's maternal aunt; and Yesenia Atondo-Garcia, relator's former sister-in-law, referred to elsewhere in the Extradition Request as YAG, JAG, or AGY ("YAG Decl."). Relator's evidence also includes copies of the following documents: (1) relator's June 1991 graduation diploma from Crozier Junior High School in Inglewood, California [Opp., Ex. A]; (2) relator's National Junior Honor Society Certificate of Membership dated April 3, 1990 [Opp., Ex. B]; (3) Certificate of Naturalization dated June 26, 1996 [Opp., Ex. C]; (4) State of California driver's license issued on January 16, 1997 [Opp., Ex. D]; and (5) State of California, Department of Motor Vehicles automobile registration for a 1986 Buick Regal, License Plate No. #VFN552, Vehicle Identification No. 1G4GM47A7A0GP417835, indicating that the registered owner of that vehicle until January 14, 1999 was one William K. Morris. [Opp., Ex. E]. That document shows that the vehicle was sold on that date and then was sold again (twice) on January 28, 1999. The last buyer was J/D Auto SL, 1609 N. Harbor Blvd., Santa Ana, California. No additional information about a buyer or registered owner is provided. [Opp., Ex. E].

In general, "[a]dmission of evidence in an international extradition proceeding is within the magistrate's discretion." In re Extradition of Kraiselburd, 786 F.2d 1395, 1399 (9th Cir.), cert. denied, 479 U.S. 990 (1986). "Participation by the fugitive at the extradition proceeding is limited; he is not permitted to introduce evidence on the issue of guilt or innocence but can only offer

evidence that tends to explain the government's case of probable cause." Hooker v. Klein 573 F.2d 1360, 1368 (9th Cir.), cert. denied, 439 U.S. 932 (1978); see Quinn, 783 F.2d at 817 n.41 (stating that the accused "may offer limited evidence to explain elements in the case against him").  Thus, the accused may  testify "to things which might have explained ambiguities or doubtful elements" in the government's case against him. Collins, 259 U.S. at 315-316; see Gill, 747 F. Supp. at 1045 (stating that the purpose of the rule against admitting "contradictory" evidence is "preventing a full-scale trial, involving witnesses telling competing stories"); Jacques Semmelman, The Rule of Non-Contradiction in International Extradition Proceedings: a Proposed Approach to the Admission of Exculpatory Evidence, 23 Fordham Int'l L. J. 1295, 1297 (2000) (explaining that under traditional extradition jurisprudence, a "rule of non-contradiction" applies permitting the accused to introduce only evidence that "explains" the government's evidence, "i.e., that provides an innocent explanation for events that the government contends point toward guilt.  In particular, to the extent that the government relies upon circumstantial evidence, the accused is generally permitted to introduce evidence that helps to explain it away.").

However, evidence that *contradicts* or *controverts* the existence of probable cause is inadmissible, including evidence establishing a defense or exonerating the accused.  Collins, 259 U.S. at 316 (holding that "evidence related strictly to the defense" was properly excluded, and that to hold otherwise would compel the requesting nation "to go into a full trial on the merits in a foreign country," contravening "the intent and meaning of the extradition treaties") (quoting In re Wadge, 15 F. 864, 866 (D.C.N.Y. 1883));  Charlton, 229 U.S. at 461 (holding that the extradition court properly excluded evidence relevant to show insanity, explaining that "[t]o have witnesses produced to contradict the testimony for the prosecution is obviously a very different thing from hearing witnesses for the purpose of explaining matters referred to by the witnesses for the government," and analogizing to the principle that "[a] defendant has no general right to have evidence exonerating him go before a grand jury"); Barapind, 400 F.3d at 749 ("Generally,

1    evidence that explains away or completely obliterates probable cause is the only evidence

2    admissible at an extradition hearing, whereas evidence that merely controverts the existence of

3    probable cause, or raises a defense, is not admissible.") (quoting Mainero, 164 F.3d at 1207 n.7);

4    Santos, 795 F. Supp. 2d at 984-985 (collecting cases); see also Semmelman, The Rule of Non-

5    Contradiction, 23 Fordham Int'l L. J. at 1296 & nn. 10-11 ("International extradition proceedings

6    in the U.S. courts are governed by the evidentiary rule that the accused has no right to present a

7    defense to the charges against him, such as an alibi defense," innocence, duress, insanity, or

8    justification) (footnotes omitted).

9    

10   Based on identifying information provided in law enforcement reports regarding the two

11   women who were questioned by Mexican authorities in Tecate on September 7, 1999 and who

12   reportedly declined to give their names but identified themselves as Luna-Ruiz's wife and aunt,

13   relator contends that De La O and Ruiz-Tapia were the subjects of those reports. [RP 127-128,

14   135]. In her declaration under penalty of perjury, however, De La O states, among other things,

15   that she was not interviewed by any law enforcement authorities in Tecate related to any

16   investigation of Luna-Ruiz or anyone else prior to December 2013, and that she did not make the

17   statements attributed to her, or to her and Ruiz-Tapia, in the report. [De La O Decl., ¶¶ 1-9].

18   Similarly, Ruiz-Tapia states in her declaration under penalty of perjury, among other things, that

19   she has "never spoken to law enforcement authorities relating to any homicide that may have taken

20   place in 1999," and that she did not make the statements attributed to one or both women in the

21   investigative report.  [Ruiz-Tapia Decl., ¶¶ 1-9].

22   

23   In her declaration under penalty of pejury, YAG states that she was never asked to identify

24   her then brother-in-law Luna-Ruiz from a six-pack photo array, but instead was asked to identify

25   a single photograph of him, and did so.  YAG further states that she was asked to sign, and did sign,

26   a statement that she did not read, and that was not read to her.  She denies making the statements

27   attributed to her in the statement included in the Extradition Request. [YAG Decl., ¶¶ 1-9].

28

Relator contends that the declarations of De La O and Ruiz-Tapia are not inadmissible recantations or "contradictory" evidence because the women deny ever having spoken with law enforcement authorities in Tecate. [Opp. 21-22]. Contrary to relator's contention, his evidence is offered to contradict or controvert the government's probable cause evidence. The government has presented competent evidence that two unnamed female relatives of Luna-Ruiz were interviewed in connection with the investigation into Cordero's homicide. Mexico has not produced, and is under no obligation to produce, witnesses who could testify to additional facts that might help identify the two women. Assuming, for purposes of this analysis, that the two unnamed women were De La O and Ruiz-Tapa, their declarations contradict the government's evidence by, among other things, denying that Mexican authorities questions them about Luna-Ruiz or about a homicide in 1999, denying that they made the statements attributed to them, denying that certain information provided about them in the reports is true or accurate, and by denying that they permitted, authorized, or facilitated a search that led to the discovery of a Buick Regal. In other words, the declarations of De La O and Ruiz-Tapa present a competing and conflicting version of the government's facts which, if believed, arguably has some tendency to support relator's defense to the homicide charge. YAG does not deny having spoken to Mexican authorities, but her declaration also contradicts the government's evidence in that YAG states that she did not pick relator's photograph out from a six-pack photo array and did not make the statements attributed to her.

Resolving the conflict between the competing versions of the facts presented in the government's evidence and relator's proffered declarations would entail weighing conflicting evidence, assessing the relative credibility of witnesses, and resolving factual disputes, functions that are beyond the scope of an extradition proceeding. Therefore, relator's declarations are not admissible. See Barapind, 400 F.3d at 749 (stating that "extradition courts 'do not weigh conflicting evidence' in making their probable cause determinations . . . ."); Bovio v. United States,

989 F.2d 255, 259 (7th Cir. 1993) (holding that the relator had "no right to attack the credibility of [the government's witnesses] at this stage of the proceedings; issues of credibility are to be determined at trial"); Eain v. Wilkes, 641 F.2d 504, 511 (7th Cir.) (stating the relator "has no right to contradict the demanding country's proof or to pose questions of credibility as in an ordinary trial, but only to offer evidence which explains or clarifies that proof"), cert. denied, 454 U.S. 894 (1981); Santos, 795 F. Supp. 2d at 989-990 (holding that the relator's "proposed witnesses' testimony is offered to contradict the [government's] version of the facts . . . and to provide a competing, conflicting version of the facts," and therefore was inadmissible); In re Extradition of Powell, 4 F. Supp. 2d 945, 957 (S.D. Cal. 1998) (denying a relator's request to present evidence relevant to show the unreliability of the government's evidence and a duress defense, because "[r]ebuttal, presentation of contradictory evidence, and examination or cross examination of witnesses are not appropriate in this setting," and allowing presentation of such evidence would amount to a "minitrial").

Even if relator's declarations are considered, moreover, they do not obliterate the government's probable cause showing, which is based primarily on the statements and identifications of eyewitnesses JUT and RTS. The declarations of De La O, Ruiz-Tapia, and YAG may tend to make some of the facts to which JUT and RTS testified more or less likely, depending on how the trier of fact assesses their credibility and weighs the evidence, but relator's declarations do not negate or explain away those facts. For example, De La O stated that for as long as she had known relator, he never lived in Mexico; in 1997, however, he visited her twice a month in Tecate, where they had met, and where relator had family. De La O said that relator always drove to visit her in a burgundy Astro van, which he had until about 2005, and that she never saw him drive any other car. She left Mexico in 1998 to live with relator in the United States, and she did not return to Mexico between 1998 and 2002. She has never known anyone to refer to Luna-Ruiz as "Tavo" or "El Tavo." [De La O Decl., ¶¶ 2-6].

Ruiz-Tapia stated that she did not live at the address where Mexican authorities said that they interviewed her in 1999, but that she had lived there from 1996 until 1997, and that her father continued to own the house and rent it out after she moved out.  She said that she had never permitted law enforcement authorities to access a garage at that address, had never seen a white Buick Regal in the garage, or at or near the house, and had never known relator to drive a white Buick Regal.  She also said she had never known relator or anyone else to live at "Calle Gran Tenochtitlan number 34, Fraccionamiento Las Huertas," the address Mexican authorities described as relator's domicile in at least one report, and that she did not believe that this "is a real address." [Ruiz-Tapia Decl., ¶¶ 3-9; <u>see</u> Extradition Request, Exhibit 7; RP 127].

YAG said that she recalled that her sister and brother-in-law left Tecate to move to the United States in 1998.  She also says that she never knew her brother-in-law to be called "El Tavo" or "Tavo," that she has always known him to wear a mustache, and that she has never known him to have a gun. [YAG Decl., ¶¶ 1-9].

If those declarations are credited, they establish that relator had significant family ties in Tecate and visited there frequently at least through 1997 or 1998, making it more plausible that relator could have been visiting Tecate at the time of Cordero's death even if he lived in the United States at that time.  Although De La O and YAG said that they never heard relator referred to as "Tavo" or "El Tavo," others could have addressed relator by those nicknames without their knowledge.  Similarly, while neither De La O nor Ruiz-Tapia knew relator to drive a Buick Regal, there is no evidence suggesting that he could not have done so on the night of Cordero's death.  Although Ruiz-Tapia denies that she lived at the address where the Buick Regal was located in a garage on September 2, 1999 or that she directed authorities to the garage, the house was owned by Ruiz-Tapia's father, so a link still exists between relator and the location where the Buick Regal was found.  Furthermore, if Ruiz-Tapia did not live there at the time, her testimony that she had not seen a white Buick Regal on or near the property would possess little probative value.

Additionally, Ruiz-Tapia's "belief" that an address described by Mexican authorities as relator's domicile was "not a real address" is speculative.

Additionally, the declarants contradict one another on the issue of when relator moved from Mexico to the United States. De La O said that she and relator were together from 1997 until 2008, and that she never knew him to live in Mexico. [De La O Decl., ¶¶ 2-3].  However, De La O's sister, YAG, said that her sister and relator were "always planning on leaving Mexico to live in the United States to raise their children.  As I recall, they left Tecate to move to the United States in 1998 . . . ." [YAG Decl., ¶ 6].

At most, relator's proffered declarations raise some issues regarding the credibility of the government's witnesses and the weight of the evidence.  They do not negate the government's probable cause showing or demonstrate the absence of probable cause.  Relator's additional documentary evidence indicating that he is a United States citizen, attended school for some period of time in the United States, and obtained a State of California driver's license in January 1997 does not contradict the government's evidence because the government does not contend that any of those facts are untrue.  Moreover, that evidence does not undermine the credibility of the government's witnesses.  [Opp., Exs. A-D].  Even if that evidence is considered, however, it does not negate or obliterate the government's probable cause showing.  Relator's evidence regarding ownership of the Buick Regal is simply inconclusive, since the DMV records do not show who owned the Buick Regal after February 1999 and indicate that no additional records concerning the vehicle's history are available. [Opp., Ex. E].

For all of these reasons, the government has met its burden to present evidence establishing probable cause to believe that Luna-Ruiz committed the charged offense of aggravated homicide. Accordingly, all of the elements required to certify Luna-Ruiz's extraditability have been satisfied.

**Findings of Fact and Conclusions of Law Regarding Extraditability**

1.     This court possesses subject matter jurisdiction to conduct extradition proceedings pursuant to 18 U.S.C. § 3184.

2.     This court possesses personal jurisdiction over relator, Gustavo Luna-Ruiz, also known as Gustavo Luna Guzman, Gustavo De La O, or "Tavo."

3.     A valid extradition treaty exists between the United States of America and the United Mexican States, namely, the Extradition Treaty between the United States of America and the United Mexican States, signed at Mexico City on May 4, 1978, and entered into force January 25, 1980 (the "Extradition Treaty").

4.     The Extradition Treaty is, and at all relevant times has been, in full force and effect.

5.     Gustavo Luna-Ruiz has been charged by Mexico with a criminal offense within its jurisdiction.

6.     The offense with which Gustavo Luna-Ruiz has been charged is an extraditable offense under the Extradition Treaty.

7.     The person before the court is the same person who is sought for prosecution in the extradition request filed by the United States of America on behalf of the United Mexican States ("Extradition Request");

8.     The Extradition Request contains competent evidence establishing probable cause to believe that Gustavo Luna-Ruiz committed the charged offense of aggravated homicide.

///

///

///

26

**Certification of Extraditability and Order for Commitment**

Pursuant to 18 U.S.C. § 3184, the court certifies to the Secretary of State of the United States of America that Gustavo Luna-Ruiz is extraditable to the United Mexican States with respect to the offense of aggravated homicide described in the Extradition Request.

**IT IS SO ORDERED.**

March 19, 2014

_____
ANDREW J. WISTRICH
United States Magistrate Judge

27